UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHELLE CATANZANO, Francine Catanzano,
Sam Catanzano, Sarah Trafton, on behalf of herself and
all persons similarly situated,

                                 Plaintiffs,

                                                            DECISION AND ORDER

                                                            89-CV-1127L

                    v.

ROBERT DOAR, as Commissioner of the New  York
State Office of Temporary and Disability Assistance and
ANTONIA NOVELLO, as Commissioner of the
New  York State Department of Health, and
JOSEPH MARTINO, as the Acting Director of the
Monroe County Department of Health and Human Services and
ANDREW DONINGER, as the Director of the Monroe County
Department of Health,

                                 Defendants.
_____

## INTRODUCTION


        This action began sixteen years ago, in 1989, on behalf of a single infant plaintiff, Michele

Catanzano, seeking declaratory and injunctive relief under 42 U.S.C. § 1983 directing the New York

State Department of Social Services ("the State") and the Monroe County Department of Health

("the County") to provide her with the level of health care that had been ordered by her treating

physician and to which she was entitled under the Medicaid Program.[1]  Some fourteen substantive decisions, six fully briefed and argued appeals to the United States Court of Appeals for the Second Circuit, and dozens of motions later, plaintiffs (this is now a class action) seek attorney's fees of approximately $1.4 million as prevailing parties under 42 U.S.C. § 1988.  That figure represented about 6800 hours of work by plaintiffs' counsel on the entire case.

## PROCEDURAL BACKGROUND

On October 17, 1989, the Court granted Michele Catanzano's motion for a preliminary injunction and ordered the County to provide her with the level of home health care prescribed by her treating physician, unless and until a contrary directive was issued pursuant to state regulations concerning home health care services or the fair hearing process mandated by New York law.  The Court subsequently granted plaintiffs' motion to certify the action as a class action, with a class consisting of all recipients of Medicaid in Monroe County who receive home health care, and who receive less home health care than most recently ordered by their treating physician.  The class was later modified and enlarged to include all New York State recipients of, and applicants for, Medicaid-funded home health care who receive less home health care than most recently ordered by their treating physician or who have had their home health care suspended, denied, terminated or

---

[1]Although various state and county officials have been named, in their official capacities, in this action over the years, for the sake of convenience the Court will refer simply to "the State" and "the County" in this Decision and Order.

reduced without prior notice, right to a fair hearing and aid-continuing as mandated by federal regulations. *See Catanzano v. Dowling*, 847 F.Supp. 1070, 1079 (W.D.N.Y. 1994).

On March 31, 1994, this Court issued a Decision and Order granting plaintiffs' motion for a preliminary injunction as to the class. In general, the Court enjoined defendants from suspending, terminating or reducing the amount of home health care services received by members of the class without first providing for notice, the right to a fair hearing and aid-continuing. *Id.* at 1086. In September of the following year, the Court issued a Decision and Order adopting a final plan ("Plan") to fully implement the requirements of the preliminary injunction. 900 F.Supp. 650, 652 (W.D.N.Y. 1995). On December 23, 1996, the Court of Appeals for the Second Circuit affirmed that judgment, 103 F.3d 223, except as to one narrow issue, which this Court addressed on remand. 992 F.Supp. 593, 595-97 (W.D.N.Y. 1998).

Thereafter, in September 1999, this Court issued a Decision and Order converting the prior preliminary injunction into a permanent injunction. The Court directed that judgment be entered in plaintiffs' favor on their cause of action alleging that defendants wrongfully denied class members notice and hearing rights with respect to various actions affecting their home health care. The Court stated that "[d]efendants must continue to comply with the injunction, the Plan and the other prior rulings of this Court and of the Court of Appeals." 189 F.R.D. 66, 70.

In that decision, I also denied plaintiffs' request to dismiss without prejudice two claims involving the adequacy of the notices used by defendants ("inadequate-notice claim") and whether notice is required when an order denying or reducing services is allegedly consistent with the treating physician's order (the "physician's order claim"). Plaintiffs contended that the Court had previously

decided those claims adversely to them, but "only in the context of plaintiffs' Preliminary Injunction Motion," and "only in the abstract ... ." *Id.* at 71. Plaintiffs requested that the Court dismiss those claims without prejudice.

With respect to the inadequate-notice claim, I stated that the Court had already "found the notices to be constitutionally sufficient as a matter of law," and that "I s[aw] no basis upon which to revisit that issue or allow plaintiffs to relitigate it," and therefore no reason "to grant the relief plaintiffs seek." *Id.*

Concerning the physician's order claim, I stated that the Court had previously ruled that "a change directed by the patient's treating physician is not the kind of change or alteration that requires notice and a fair hearing." *Id.* The Court also stated that the class had never been "so broadly defined as to include recipients whose services have been reduced by their own physician," *id.* at 72, and that "I decline[d] to expand the scope of the injunction or the Plan to include" these matters. *Id.* at 72-73. Plaintiffs' other remaining claims, however, were dismissed without prejudice. *Id.* at 73.

Plaintiffs then appealed from my denial of their request to dismiss the inadequate-notice and physician's order claims without prejudice. The Second Circuit vacated and remanded as to both claims. The court held that the inadequate-notice claim had been mooted by intervening events, and directed this Court to dismiss that claim without prejudice. The Court of Appeals also directed this Court to dismiss plaintiffs' physician's order claim without prejudice, stating that this claim involved issues that were "not ready for final judgment on the record before us or before the district court,"

and that the State would "not be prejudiced by this claim because it has been litigated to such a limited extent."  277 F.3d 99, 110 (2d Cir. 2001).[2]

On March 18, 2004, plaintiffs filed the motion for attorney's fees.  The parties worked toward a settlement of the fee issue and they were partially successful, at least to the County.

On August 9, 2004, the parties filed a stipulation by which they agreed that the County would be responsible for 1682 of the hours billed by plaintiffs' counsel in this case, and that the County would pay plaintiffs $294,740 in attorney's fees and costs, in full satisfaction of plaintiffs' claims against the County for fees and costs.  The parties also agreed that the State would not defend against plaintiff's motion for attorney's fees on the ground that the County should be liable for more than 1682 hours, nor would the State seek any contribution from the County to satisfy the State's liability for attorney's fees.  Dkt. #316.  Accordingly, all that remains before me at this point is plaintiffs' motion for attorney's fees and costs against the State, which the State opposes on a number of grounds.

## DISCUSSION

### I. Attorney's Fees Under 42 U.S.C. § 1988–General Principles

Section 1988 of Title 42 provides that in a federal civil rights action, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs."  In this Circuit, "[t]he lodestar approach governs the initial estimate of reasonable fees."  *Grant v. Martinez*,

---

[2]In a separate Order issued today, I have dismissed both those claims without prejudice.

- 5 -

973 F.2d 96, 99 (2d Cir. 1992).  Under this approach, "the number of hours reasonably expended on the litigation [are] multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Grant*, 973 F.2d at 99.

The fee applicant has the burden to establish the reasonableness of both the number of hours worked and the rate charged. *Hensley*, 461 U.S. at 433; *Alnutt v. Cleary*, 27 F.Supp.2d 395, 399 (W.D.N.Y. 1998).  The initial fee calculation should exclude hours that were not "reasonably expended" because they were "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434.  A reasonable rate is one that is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984).

Although there is a strong presumption that the lodestar figure represents the reasonable fee, *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992), other considerations may lead to an upward or downward adjustment of the lodestar. *Hensley*, 461 U.S. at 434.  The most critical factor to consider is the degree of success obtained by the plaintiff. *Id.* at 436.

As discussed below, the State challenges plaintiffs' fee request in several respects.  The State does not, however, object to the hourly rates by any of the attorneys that appeared for plaintiffs in this action.  I have reviewed these rates as well and find them to be reasonable.


## II. Whether Plaintiffs Are "Prevailing Parties"

The first issue is whether plaintiffs are "prevailing parties" in this action.  The State contends that they are not.

"Generally, the Supreme Court has given a 'generous formulation' to the term prevailing party, stating that plaintiffs may be entitled to attorney's fees 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Roberson v. Giuliani*, 346 F.3d 75, 79 (2d Cir. 2003) (quoting *Hensley*, 461 U.S. at 433) (internal quotation marks omitted). "Essentially, in order to be considered a 'prevailing party' ..., a plaintiff must not only achieve some 'material alteration of the legal relationship of the parties,' but that change must also be judicially sanctioned." *Id.* at 79-80 (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001)). I find that plaintiffs have met their burden under this test of establishing that they are in fact a prevailing party.

The State contends, in part, that plaintiffs are not prevailing parties because they have not identified any particular individual who benefited from the preliminary injunction. This argument is meritless. The Supreme Court has stated that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff," *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). The case law establishes that obtaining an injunction such as the one issued in this case meets that test and is adequate to confer "prevailing party" status on plaintiffs. *See*, *e.g.*, *Gerling Global Reinsurance Corp. of America v. Garamendi*, 400 F.3d 803, 806 (9th Cir.) (insurance companies "prevailed" in their challenge to California's Holocaust Victim Insurance Relief Act ("HVIRA") when they obtained permanent injunction against enforcement of HVIRA), *amended on other grounds on denial of reh'g*, 410 F.3d 531 (9th Cir. 2005); *Abrahamson v. Board of Educ. of Wappingers Falls Cent. School Dist.*, 374 F.3d 66, 79 (2d Cir.) (holding that plaintiff teachers who

obtained injunction requiring defendant school district and union to bring collective bargaining agreement into compliance with Age Discrimination in Employment Act were prevailing parties, since the existence of the injunction and the ability to enforce it materially altered the legal relationship between the parties; "[T]he teachers obtained through their judgment some, though not all, of the benefit they initially sought and consequently are entitled to attorneys' fees"), *cert. denied*, 125 S.Ct. 605 (2004).

Under this standard, plaintiffs clearly "prevailed" in this action.  First, Michelle Catanzano herself obtained individual relief as far back as 1989, when the Court issued an injunction ordering defendants to provide her with the level of home health care prescribed by her treating physician without a fair hearing.  In addition, the statewide class obtained significant relief when the Court issued another injunction enjoining defendants from, *inter alia*, "suspending, terminating or reducing the amount of home health care services received by members of plaintiffs' class as a result of conducting a fiscal assessment or otherwise, without first providing for notice, the right to a fair hearing and aid-continuing ... ." 847 F.Supp. at 1086.  Subsequent decisions of this Court and of the Court of Appeals for the Second Circuit further implemented and reaffirmed that injunction.

Defendants offer no authority for imposing on plaintiffs a requirement that they identify some specific individual who benhhhefited from the Court's grant of injunctive relief.  Aside from the fact that Michelle Catanzano herself benefited, the class as a whole benefited in a significant way.  The primary relief sought in this action was to secure due process rights for Medicaid-funded recipients of home health care, and that is essentially what plaintiffs achieved.

### III. Effect of the State's Rule 68 Offer

The State next contends that a fee award in plaintiffs' favor is barred by Rule 68 of the Federal Rules of Civil Procedure, which provides that "a party defending a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued." If the offeree rejects the offer, and "the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after making the offer." Although on its face the rule only provides that the offeree must pay the offeror's post-offer costs, Rule 68 has been interpreted to bar recovery of attorney's fees under a fee-shifting statute where the prevailing party did not receive a more favorable recovery than what had been offered to it under Rule 68. *See Marek v. Chesny*, 473 U.S. 1, 9-12 (1985).

In the case at bar, the State made a Rule 68 offer in December 1995. The State offered to allow a final judgment to be taken against it

> for a permanent injunction and declaratory relief in accordance with the District Court's preliminary injunction entered March 31, 1994; in accordance with the District Court's Order entered July 28, 1994 as affirmed by the Court of Appeals [60 F.3d 113]; in accordance with the District Court's Order entered June 22, 1995 [which directed the parties to submit a report to the Court on whether they had been able to agree on a plan to implement the preliminary injunction], and in accordance with the District Court's Order entered September 20, 1995, and the Implementation Plan attached as Exhibit A to said Order, together with costs, including attorneys fees, accrued. Said final Judgment would be in full satisfaction of all of plaintiff's claims against [the State]. If this offer is accepted, [the State's] pending appeals would be withdrawn with prejudice.

Affirmation of James L. Gelormini (Dkt. #305) Ex. 1 (first brackets in original).[3] Plaintiffs rejected

that offer, but they now contend that the relief that they obtained was more favorable to them than

that contained in the State's offer, and that the offer was impermissibly vague.  I agree.  Plaintiffs

did eventually receive a more favorable result, and I also conclude that the offer was sufficiently

"ambiguous" in the context of this case and, therefore, does not preclude an award of costs and

attorney's fees.

At the outset, I note that there is some question whether Rule 68 even applies to cases

involving injunctive relief, due to the difficulty of quantifying the "value" of such relief.  *See, e.g.*,

*Marek v. Chesny*, 473 U.S. 1, 33 n. 48 (1985) (noting the inherent "difficulties in assessing the

'value' of nonpecuniary relief") (Brennan, J., dissenting); *Garrity v. Sununu*, 752 F.2d 727, 731 (1st

Cir. 1984) (questioning, though not deciding, "whether Rule 68 applies at all in cases like this which

involve complex injunctive remedies rather than easily compared dollar damages"); *Reiter v.*

*Metropolitan Trans. Auth. of New York*, 224 F.R.D. 157, 164 (S.D.N.Y. 2004) (stating that

"equitable relief is not susceptible of a ready comparison either with monetary relief or even with

a differing form of equitable relief"); *Martin v. Mabus*, 734 F.Supp. 1216, 1222 (S.D.Miss. 1990)

("in complex cases such as the one *sub judice*, involving injunctive relief, there is a fundamental

question whether rule 68 may, under any circumstances, properly foreclose the recovery of statutory

---

[3]The July 28, 1994 Order referred to in the State's offer denied defendants' motion for
summary judgment and plaintiffs' cross-motion for partial summary judgment on one of their
claims for relief.  The Order also denied plaintiffs' motion to amend the Court's June 14, 1994
Decision and Order, which had been issued in an attempt to clarify the parties' confusion as to
the scope of the preliminary injunction order.  Plaintiff's motion to amend was denied as
unnecessary, since the Court concluded that the July 28 Decision and Order made clear that
defendants' interpretation of the injunction was erroneous.

attorney's fees"); *but see Reiter*, 224 F.R.D. at 164 (noting that "[d]espite these difficulties, when equitable relief is compared with equitable relief courts have typically arrived at some basis upon which to make a comparison").

Although the fact that a case involves equitable relief does not appear to be a *per se* bar to the application of Rule 68, I find that the rule does not apply on the facts of this case. The State's offer was ambiguous about the terms of the proposed "permanent injunction and declaratory relief." Because the State did not spell out those terms, and never responded to plaintiffs' counteroffer, plaintiffs could not have made an informed choice whether to accept the offer.

"Courts apply general contract principles to interpret Rule 68 offers of judgment." *Basha v. Mitsubishi Motor Credit of America, Inc.*, 336 F.3d 451, 453 (5th Cir. 2003); *see, e.g., Goodheart Clothing Co., Inc. v. Laura Goodman Enterprises, Inc.*, 962 F.2d 268, 272 (2d Cir. 1992). In accordance with that approach, "Rule 68 offers have been likened to contract offers in that there must be a 'meeting of the minds' and a clear understanding of the terms in order to have a valid acceptance of the offer." *Boorstein v. City of New York*, 107 F.R.D. 31, 33-34 (S.D.N.Y. 1985); *see also Christian v. R. Wood Motors*, No. 91-CV-1348, 1995 WL 238981, at *10 (N.D.N.Y. Apr. 21, 1995) ("a Rule 68 offer, as with any other contract, requires a meeting of the minds").

By the same token, "[b]ecause a Rule 68 offer has a binding effect when refused as well as when accepted, a party must also have a clear understanding of the terms of an offer in order to make an informed choice not to accept it." *Boorstein*, 107 F.R.D. at 34; *accord Radecki v. Amoco Oil Co.*, 858 F.2d 397, 402-03 (8th Cir. 1988) (citing *Boorstein*). If an offer of judgment is ambiguous, the offeree obviously cannot make an informed choice whether to accept or reject it. *See Basha*, 336

F.3d at 455 ("Rule 68 offers must provide 'a clear baseline from which plaintiffs may evaluate the merits of their case relative to the value of the offer'") (quoting *Thomas v. National Football League Players Ass'n*, 273 F.3d 1124, 1130 (D.C.Cir. 2001)).

Here, the State's Rule 68 offer, at first blush, seems straightforward enough:  the State would "allow a final judgment to be taken against [the State] for a permanent injunction and declaratory relief in accordance with" the prior orders of this Court and of the Court of Appeals, "in full satisfaction of all of plaintiff's claims against" the State.  The devil was in the details, however.  The surface simplicity of the State's offer masked the parties' persistent inability to agree on the meaning of those various orders.

Those disagreements had previously been noted by this Court.  As stated, the Court issued a decision on March 31, 1994 enjoining defendants from undertaking certain acts in connection with the provision of home health care services to class members.  Within days after that decision was issued, disputes arose between the parties concerning the meaning and effect of the injunction. Largely because of those disputes, the parties were also unable to agree on a plan for the implementation of the injunction.

On June 14, 1994, therefore, the Court issued another Decision and Order that was intended to clarify the disputed aspects of the March 31 Decision and Order.  In my June 14 decision, I noted that "[t]he parties ha[d] a marked difference of opinion concerning the scope of the March 31 Decision and Order," and that "the scope of the disputes among the parties has expanded, rather than contracted, and further proceedings and decisions of this Court appear to be necessary to resolve all of them."  Dkt. #166 at 3, 5.

This attempt to clarify matters was only partially successful.  On June 28, 1994, plaintiffs moved to amend or clarify the June 14 Decision and Order, because, apparently, the parties still disagreed about certain aspects of the preliminary injunction.  On July 28, 1994, the Court issued yet another Decision and Order, denying plaintiff's motion as unnecessary, because, the parties' disagreements notwithstanding, the directives contained in my March 31 and June 14 orders "could not have been clearer." Dkt. #183 at 16.  I noted that "in the process of attempting to implement that decision and the Court's preliminary injunction decision, defendants and plaintiffs have interpreted the scope of the Court's decisions in a markedly different fashion," *id.*, and that the June 14 Decision and Order had been intended "to clarify the parties' confusion as to the scope of the preliminary injunction order ... ."  *Id.* at 17.

Although these decisions were issued prior to the State's Rule 68 offer, I am not convinced, based on my familiarity with the tortuous history of this case, that at the time the offer was made, the parties at last saw eye-to-eye about all the parameters of this Court's prior orders and the Plan that the Court issued on September 20, 1995 (Dkt. #220), so as to make it clear to plaintiffs exactly what the issuance of a "permanent injunction and declaratory relief" would entail if they accepted the State's offer. Although the Court may have believed that its orders were clear, the parties obviously did not see it that way.

That point is further illustrated by other events in the case, including some that occurred after the State made its Rule 68 offer.  For instance, after I issued my September 20, 1995 Decision and Order adopting a final implementation plan, the State moved for reconsideration with respect to one issue concerning whether the so-called "Freedom of Choice" law, 42 U.S.C. § 1396a(a)(23),

conflicted with the New York Medicaid Program obligating home health care providers to provide care under certain circumstances.  I denied the motion, based partly on my belief that the Second Circuit had already decided the issue adversely to defendants in one of its prior decisions in this case. 900 F.Supp. at 652.

On appeal, the Court of Appeals held that it had not previously addressed the Freedom-of-Choice-law issue, and remanded for further proceedings.  103 F.3d at 232-34.  On remand, I denied the State's motion to reconsider and to modify the Plan, finding that it did not conflict with the Freedom of Choice law.  992 F.Supp. at 595-97.  It is obvious, then, that prior to the issuance of the Second Circuit's 1996 decision, there was some dispute or misunderstanding concerning the implications of the Court of Appeals' prior decisions in this case.

In addition, on September 1, 1999, this Court ruled on plaintiffs' motion for an order entering a final judgment on some of plaintiffs' claims, granting summary judgment as to one of their claims, and dismissing, without prejudice, plaintiffs' remaining claims.  Defendants objected to the motion on the grounds that plaintiffs' request for entry of final judgment was too broad in some respects, and too narrow in others.  *See* Dkt. #283, at 5-6.

Again, I found that "this Court's prior decisions ... define the parties' relative rights and obligations with sufficient specificity and clarity," that "[f]urther reiteration of these matters would serve no useful purpose," and that the Plan "embodies and effectuates my prior decisions in this area, and no further elaboration or attempts to refine its language is necessary."  *Id.* at 6.  Clearly, however, the parties themselves consistently held divergent views concerning their respective "rights and obligations" as set forth in the Court's prior decisions.

A dispute also existed concerning plaintiffs' claim that class members were entitled to notice and hearing rights when services were denied or discontinued because of alleged concerns about the health and safety of Certified Home Health Agency employees.  Plaintiffs claimed that defendants were using certain language in the Court's June 22, 1995 Decision and Order "as a loophole to deny care to applicants," whereas defendants contended that I had already ruled in defendants' favor on that issue in my June 22, 1995 decision.  *Id.* at 9.  Although in my September 1999 Decision and Order I found that this issue was outside the scope of this action, this again demonstrates that the parties did not share a mutual understanding of the meaning and effect of some of the Court's prior decisions in this case.

Where a rejected Rule 68 offer was deemed to be ambiguous in some material respect, courts have held that it cannot later be used by the offeror to recover costs from the offeree, or to bar the offeree from seeking attorney's fees under a fee-shifting statute.  In *Basha*, for example, the Court of Appeals for the Fifth Circuit held that a defendant's offer of judgment in a suit for violation of the Fair Debt Collection Practices Act, in which the defendant agreed to pay statutory damages but left the amount of additional "actual damages" to later agreement of the parties' attorneys, was invalid for failure to properly quantify damages.  The court stated that "[b]ecause the offer purported to settle all claims, yet failed to quantify damages, ... mutual assent did not exist between the parties. Moreover, such a vague offer of judgment did not provide Basha with a clear baseline to evaluate the risks of continued litigation.  To hold otherwise would be to strip Rule 68 of its purpose."  336 F.3d at 455.

Similarly, in *Arkla Energy Resources, a Div. of Arkla, Inc. v. Roye Realty and Developing, Inc.*, 9 F.3d 855 (10th Cir. 1993), the court held that the defendant-offeror was not entitled to attorney's fees under Rule 68, where the defendant never sufficiently clarified the value of its offer, despite the defendant's contention that the value of the offer was irrelevant because the plaintiff ultimately did not recover anything.  In so ruling, the court stated that "the ambiguity was critical not because the offer must be accurately compared to the outcome at trial, but because the offeree must know what is being offered in order to be responsible for refusing the offer."  *Id.* at 867.  *See also Jones v. Fleetwood Motor Homes*, 127 F.Supp.2d 958, 970 (N.D.Ill. 2000) (holding that an "ambiguity [in defendant's offer of judgment] is fatal to Fleetwood's contention that it is entitled to cost-shifting under Rule 68"); *Christian*, 1995 WL 238981, at *10 (refusing to enforce Rule 68 offer where there was no clear understanding between the parties as to the terms of the offer).

Many of these cases involved offers for monetary relief that failed to specify exactly how much the offer was for, or what components (*e.g.*, attorney's fees, compensatory damages, etc.) it would include.  The fact that the instant case involves equitable relief, however, makes the State's Rule 68 offer that much *more* ambiguous.  As noted earlier, it is inherently difficult to quantify the "value" of injunctive relief.  Where the offered relief is couched in general terms relating to previously-issued court orders, the correct interpretation of which has been the subject of frequent, pointed disagreement between the parties, the difficulties an offeree has in discerning the precise terms of the offer are compounded even further.

Even if the State's offer were not fatally ambiguous, however, I would find that Rule 68 does not bar plaintiffs from recovering attorney's fees. The relief finally obtained by plaintiffs in this case was more favorable than that offered by the State.

After receiving the State's offer, plaintiffs' counsel responded by letter (to which the State never responded), stating that he would recommend to his clients that they accept the offer, but only if five specified conditions were met. *See* Reply Declaration of Bryan D. Hetherington (Dkt. #312) Ex. B. The conditions demanded by plaintiffs' counsel need not be set forth in detail here, but in large part they involved severing certain issues from the case without prejudice to class members or other individuals seeking relief on those issues in a separate action. That differed from the State's offer, under which the proposed final judgment "would be in full satisfaction of *all* of plaintiff's claims" against the State. (Emphasis added.) In essence, the State was asking plaintiffs to agree to dismiss their other claims *with* prejudice in exchange for the entry of a permanent injunction.

This Court's September 1999 Order entering a final judgment in this case effectively gave plaintiffs the relief they had requested in their counsel's response to the State's Rule 68 offer. The Court converted the preliminary injunction into a permanent injunction, and directed the parties to comply with the Plan, and with all other prior rulings of this Court and of the Court of Appeals for the Second Circuit. Plaintiff's remaining claims were dismissed without prejudice. The final judgment, then, was closer, if not identical, to plaintiffs' counteroffer, as compared with the State's offer.

If plaintiffs had accepted the State's offer, they would have obtained a permanent injunction on their second cause of action, but they also would have effectively been foreclosed from ever

seeking relief on their other causes of action; the offer provided that the "final Judgment would be in *full* satisfaction of *all* of plaintiff's claims" against the State.  Gelormini Aff. Ex. 1 (emphasis added).  That was apparently unacceptable to plaintiffs, since their attorney made a counteroffer proposing that plaintiffs' other claims would be severed and dismissed without prejudice, so that individual class members could seek relief on those claims in separate actions.  Obviously, then, plaintiffs themselves considered the State's offer to be "less favorable" than what was outlined in their counteroffer.

Having claims dismissed without prejudice may seem only modestly more favorable than having them dismissed with prejudice, but that is beside the point.  Rule 68 simply provides that a plaintiff who rejects an offer of settlement will be liable for the offeror's post-offer costs (and by implication will be barred from recovering attorney's fees under a fee-shifting statute like § 1988) if the relief finally obtained is "not more favorable" than what was offered.  As long as the ultimate relief is more favorable than that which was offered–as it was here–a successful § 1983 plaintiff may seek fees under § 1988.  *See Bright v. Land O' Lakes, Inc.*, 844 F.2d 436, 444 (7th Cir. 1988) (rejecting argument that because actual damage award of $226,608.91 came "surprisingly close" to the $225,000 offer of judgment, district court should have exercised its discretion and reduced or denied plaintiff's claim for post-offer costs).

## IV. Adequacy of Documentation in Support of Plaintiffs' Fee Application

The State next contends that plaintiff's fee application is inadequately documented.  In particular, the State notes that although plaintiffs seek fees for work performed by nineteen attorneys

over the course of this multi-year litigation, they have failed to submit affidavits from seventeen of those attorneys. The State also asserts that the affidavits that plaintiffs have submitted–of attorneys Bryan Hetherington and (now Rochester City Court Judge) Ellen Yacknin–fail to demonstrate that their time records are accurate, that the time was reasonably expended, or how the work performed was relevant to this action.

I reject these arguments. The State takes an overly strict view of the requirements for documentation of a fee request in this circuit. The Court of Appeals did hold in *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983), that a party seeking an award of attorney's fees must support the request with contemporaneous time records that "specify, for each attorney, the date, the hours expended, and the nature of the work done," but the court did not state that each attorney must file a separate affidavit, and courts both within and without this circuit have not imposed such a requirement. *See*, *e.g.*, *New Leadership Committee v. Davidson*, 23 F.Supp.2d 301, 310 (E.D.N.Y. 1998) (finding sufficient affidavits of two attorneys setting forth their own work on the case, plus that of an associate and two law students); *Calhoun v. Acme Cleveland Corp.*, 801 F.2d 558, 559-60 (1st Cir. 1986) (holding that although the better practice is for each attorney to submit an affidavit, failure of each attorney to file an affidavit was not fatal to plaintiff's motion for attorney's fees); *Jordan v. United States Dep't of Justice*, 691 F.2d 514, 519 (D.C. Cir. 1982) (fee petition was adequately supported by lead attorney's affidavit, in which he attested to the number of attorney and student hours expended on the case, based on his examination of attorneys' and students' time sheets and the case file).

The purpose of the contemporaneous-record requirement is simply to provide the court with enough information to "audit the hours and determine whether they were reasonably expended." *King v. JCS Enterprises, Inc.*, 325 F.Supp.2d 162, 166 (E.D.N.Y. 2004) (citing *New York State Ass'n for Retarded Children*, 711 F.2d at 1148).   Here, the declarations of attorneys Hetherington and Yacknin make clear that the all of plaintiffs' attorneys' time records that have been submitted in this case were contemporaneously maintained, and that the time records were business records of the entities that employed those attorneys. *See* Hetherington Decl. (Dkt. #294) ¶¶ 4-7, 13; Yacknin Decl. (Dkt. #296) ¶ 4; Hetherington Reply Decl. (Dkt. #312) ¶ 92.   Those declarations, and the time records themselves, are also for the most part sufficiently detailed to enable the Court to determine whether the hours in question were reasonably expended.[4]

Moreover, to have prepared the affidavits of seventeen additional attorneys, a number of whom are no longer employed by the offices where they worked at the time when they worked on this case, and some of whom apparently no longer live in the Rochester area, *see* Hetherington Reply Decl. ¶ 94, would have required the expenditure of considerably more time for which plaintiffs would have sought compensation from the State.   The two attorneys who did submit affidavits, Hetherington and Judge Yacknin, spend the most hours in the case -- 72%.   Most of the rest of the attorneys involved only worked a few hours on the case, *see* Hetherington Decl. Ex. A, and it would be difficult to justify spending additional hours in tracking down these individuals to obtain affidavits from them, particularly when the attorneys who performed the bulk of the work in this case

---

[4]The lack of specificity of some of the entries is addressed below.

are able to state, based on their personal knowledge, that the other attorneys' time records were contemporaneously maintained.

## V. Reasonableness of Time Expended

The State also contends that plaintiffs have failed to show that the hours for which they seek fees were reasonably expended.  The State relies upon the principle that

> [c]ounsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.  "In the private sector, 'billing judgment' is an important component in fee setting.  It is no less important here.  Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."

*Hensley*, 461 U.S. at 434 (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc). In short, an applicant for fees must exercise "billing judgment" in fashioning the fee request. Under this principle, excessive, redundant, or unnecessary hours are to be excluded from a fee award, and a district court may apply a reasonable percentage reduction as a practical shortcut to do so. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).

The State lists a number of reasons why plaintiffs' counsel's time entries allegedly fail to accord with the "private sector billing judgment" rule.  These include the sheer number of attorneys who worked on the case, time entries for multiple attorneys at a single meeting or other proceeding, excessive time spent on meetings or discussions about the case, excessive time spent editing and reviewing each other's work, and other allegedly unreasonable expenditures of time.

In response, plaintiffs note that they have already reduced the overall time for which compensation is claimed by 10% to account for excessive hours. They also contend that the State's math is wrong, particularly in calculating the amount of time spent in meetings.

As to the number of attorneys involved, that alone is not a basis for reducing plaintiffs' fee award. The question is not simply how many attorneys worked on the case, but whether their time was reasonably spent. The use of multiple attorneys might lead to duplication of effort or other inefficiencies, and their time sheets must be scrutinized accordingly, but it is not *per se* unreasonable. In fact, at times it might be *more* reasonable than using only one or two attorneys, since lower-paid junior attorneys, student interns and paralegals can perform some work at less cost than senior attorneys.

It is also worth noting that this was a lengthy case involving complex issues of considerable significance to many members of the public. The Court of Appeals stated that "[t]his case has a long history" in December 1996, but years of litigation still lay ahead at that time. 103 F.3d at 226. No less than fourteen decisions (not including this one) on substantive issues have been rendered by this Court and the Court of Appeals over the course of this action, and there have also been six appeals argued before the Second Circuit, and dozens of motions of various types. Given the Byzantine statutory and regulatory schemes involved, it should come as no surprise that this case took many

years to litigate.[5]  Likewise, it is hardly surprising that many attorneys would end up working on this case at one time or another, if only due to turnover at their respective agencies.

At least some of the responsibility for the protracted history of this case must also be laid at the State's feet.  To say that the State vigorously defended this case would be an understatement.  The State contested everything, usually unsuccessfully. While I am not suggesting that the State's defense was undertaken in bad faith, the State should not now be heard to complain because its own tactics necessitated plaintiffs' use of multiple attorneys, or forced plaintiffs' counsel to expend additional time on the case.  As the First Circuit colorfully put it in another case, the State "mounted a Stalingrad defense ..., battling from rock to rock and tree to tree.  After setting such a militant tone and forcing the plaintiffs to respond in kind, it seems disingenuous for the [State] to castigate the plaintiffs for putting too many troops into the field."  *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 298 (1ˢᵗ Cir. 2001); *see also City of Riverside v. Rivera*, 477 U.S. 561, 581 n. 11 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response") (citation and internal quotation marks omitted).

With respect to the time charged to internal meetings, I note that as a general principle, "time spent in attorney conferences is generally compensable for each participant." *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 278 F.Supp.2d 1301, 1315 (M.D.Fla. 2003) (citing *National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d

---

[5]At oral argument on plaintiffs' preliminary injunction motion in January 1994, the Court observed, "If I ever get to be a legislator, I will not write regulations or statutes like this.  There ought to be regulations about plain language.  These things are mind boggling.  When you have lawyers and judges who can't read these things, I don't see how some patient in a hospital bed in Brooklyn is supposed to do it."  Dkt. #147 at 33-34.

1319, 1337 (D.C.Cir. 1982)).  *See also  Stacy v. B.Q. Stroud*, 845 F.Supp. 1135, 1144 (S.D.W.Va. 1993) ("Conferences between attorneys ... are necessary, valuable, and often result in greater efficiency and less duplication of effort, thus requiring fewer hours overall").  In *Berberena v. Coler*, 753 F.2d 629 (7th 1985), for example, in which the plaintiffs successfully challenged Illinois's method for calculating the eligibility of low-income working parents for aid to families with dependent children, the Seventh Circuit held that the district court did not abuse its discretion in allowing compensation for time that two attorneys spent attending strategy conferences and other meetings with two other attorneys who carried most of the responsibility for the litigation.  In so holding, the court recognized that "this was a difficult case with significant social effects and that the participation of the two attorneys in question in the strategy conferences and negotiations may indeed have been crucial to [their] subsequent participation in the case."  *Id.* at 633 (internal quotes omitted).  The court also found no abuse of discretion in the district court's finding that the time sheets of those attorneys indicated no duplication of effort or improper utilization of time.  *Id.*

Concerning the particular hours charged here, the State's assertion that about 27% of the hours charged against the State are attributable to meetings among plaintiffs' attorneys is demonstrably incorrect.  The State asserts that plaintiffs charged 1055 hours to meetings (which plaintiffs contend is an inflated figure that is not supported by counsel's time records), and that "[t]hese 1,055 hours represented approximately 27% of the total 4861 hours plaintiffs seek to charge against the State."  Gelormini Aff. ¶ 78.  In fact, 1055 divided by 4861 equals 21.7%, not 27%.[6]

---

[6]In addition, the State's reference to 4861 hours was based on its determination that 1932.5 hours of plaintiffs' counsel's time were attributable to the case against the State.  The parties having since stipulated that the County would be responsible for 1682 hours means that

(continued...)

I also find that plaintiffs have convincingly demonstrated that there are other errors in the State's calculations about the amount of time charged to meetings and conferences. It appears, for instance, that the State's figure of 1055 hours includes time that in fact has not been charged for purposes of plaintiff's attorney's fee motion, as well as hours that were entered twice by the State. *See* Affidavit of Sarah Rapke (Ex. C to Hetherington Reply Decl.) ¶¶ 5, 8. Other entries in the State's calculations do not appear to correspond to any entries in plaintiff's attorney's time records. *See* Affidavit of Ricja Rice (Ex. D to Hetherington Reply Decl.) ¶¶ 5-8.

Having said that, I do believe that some further reduction of the hours charged is warranted. Plaintiff's counsel admits that "there was an issue with time billed at meetings," Hetherington Reply Decl. ¶ 84, and that "the amount of time for some meetings seemed too large ... ." *Id.* He also concedes that "[t]here is some inherent inefficiency" in having various attorneys within the same office review and edit each other's briefs and other papers, *id.* ¶ 91, and that some time entries were for noncompensable clerical tasks. *Id.* ¶ 109. In addition, while most of the time entries are sufficiently detailed to enable the Court to determine whether the time was reasonably spent, there are occasional references to meetings and telephone calls that do not make clear what the meetings or calls were about. While counsel has commendably reduced the time charged by 10% on this fee application, I am not convinced that this is enough to "trim[ the] fat" from plaintiffs' request, *Kirsch*, 148 F.3d at 173 (quoting *New York State Ass'n for Retarded Children*, 711 F.2d at 1146), and

---

[6](...continued)
over 5100 hours are attributable to the case against the State, which would reduce the percentage still further.

accordingly will reduce plaintiffs' counsel's hours by an additional 8%, for all work through the filing of the fee application.

## V. Limited Success/Unsuccessful Claims

The State further contends that plaintiffs' fee award should be reduced to reflect what the State characterizes as plaintiffs' limited success, and that plaintiffs should not be awarded fees for work spent on their first, third, fourth and fifth causes of action, which were all dismissed without prejudice.

The Supreme Court stated in *Hensley* that when "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount," and that "the most critical factor is the degree of success obtained."  461 U.S. at 436.  In such circumstances, the district court may, in its discretion, "attempt to identify specific hours that should be eliminated, or it may simply reduce the [requested] award to account for the limited success." *Id.* at 436-37. *See, e.g., Green v. Torres*, 361 F.3d 96, 99 (2d Cir. 2004) (district court did not abuse its discretion in reducing plaintiff's award of attorney's fees in civil rights action by 20% for limited success, based on fact that no material evidence supported claims which plaintiff voluntarily withdrew one week prior to trial).

The *Hensley* Court also addressed the distinction between wholly unrelated claims that involve different sets of facts and different legal theories and claims that "involve a common core of facts" or are "based on related legal theories."  461 U.S. at 435.  With respect to the former, the Court stated that

> even where the claims are brought against the same defendants ... counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved. The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Id.* at 434-35 (quotation omitted).

With regard to attorney's fees for related claims, however, the Court explained that in some civil rights cases

> the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.* at 435. "Therefore, when a plaintiff fails to prove one of two overlapping claims–*e.g.* a discriminatory discharge–but prevails on the other–*e.g.* retaliation for complaining of discrimination–the plaintiff may recover fees for all the legal work." *Wilson v. Nomura Securities Intern., Inc.*, 361 F.3d 86, 90-91 (2d Cir. 2004). *See, e.g., Dominic v. Consolidated Edison Co. of New York, Inc.*, 822 F.2d 1249, 1259-60 (2d Cir. 1987) ("the factual and legal theories underlying Dominic's age discrimination claim were inextricably intertwined with those underlying his retaliatory discharge claim. Consequently, a fully compensatory fee award was justified because Dominic recovered the same relief on the retaliation claim that he would have on his discrimination claim").

In the case at bar, the Court entered judgment in plaintiffs' favor only on their second claim for relief, which alleged that defendants failed to comply with federal notice, hearing, and aid-

- 27 -

continuing prior to adverse decisions concerning the provision of home health care services.  The first, third, fourth and fifth claims ("the dismissed claims"), however, were left undecided:

(1) The State's Medicaid system violates the Medicaid Act by permitting the provision of less than the amount of home health care determined to be medically necessary by the treating physician;

(3) The State's system violates the Medicaid Act's requirement that a "single state agency" administer the state's medical assistance plan;

(4) The State's system violates the Medicaid Act's utilization control regulations; and

(5) The State has deprived plaintiffs of their liberty in violation of the Due Process Clause by forcing them to be institutionalized against their will and against professional judgment.

189 F.R.D. at 70.

The Court eventually dismissed those four claims without prejudice in 1999.  In doing so, the Court addressed defendants' request that if dismissal of these claims without prejudice were allowed, the dismissal be on condition that no fees or costs associated with those claims be awarded by the Court:

As for attorney's fees and costs, plaintiffs have not indicated an intent to seek fees or costs with respect to these claims.  Fee shifting statutes allow for fees only on claims that have been successfully prosecuted, not those that have been dismissed.  In any event, whether plaintiffs will be entitled to *any* award of fees or costs is simply not before me at this time, and I see no need to decide those matters now.

189 F.R.D. at 70.

The State now argues that plaintiffs should not be awarded any fees for work performed on the dismissed claims.  The State also contends that because these claims were dismissed, plaintiffs

have achieved only partial or limited success in this case.  The State further notes several instances in which this Court rejected certain arguments advanced by plaintiffs concerning various issues, or denied certain of their requests for specific types of relief.

I am not persuaded by these arguments. First, my reference in the final judgment to attorney's fees does not preclude relief here.  The plaintiffs had not moved for such relief and I made no definitive ruling on the matter.

Second, I believe that the dismissed claims fall into *Hensley*'s category of "claims for relief [that] involve a common core of facts or [are] based on related legal theories."  Although each claim was based on a distinct legal theory (as separate causes of action generally are), they all arose out of a common nucleus of facts.  In that circumstance, *Hensley* directs district courts to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," not on trying to dissect counsel's time records to extract and discard hours spent on these other claims.  461 U.S. at 435.

Here, although the complaint did set forth separate claims for relief, based on particular legal theories, the injunctive relief requested as to all the claims was virtually the same as the relief that was ultimately obtained. Plaintiffs sought similar relief under different theories.  The complaint asked the Court to require defendants to comply with federal and state notice, hearing, and aid-continuing requirements, to provide home health care services to class members as ordered by their treating physicians, and to establish and implement a plan to ensure that authorized home health care services would actually be delivered to class members in Monroe County who were receiving less care than ordered by their treating physicians.  Dkt. #97 at 38-39.

The Court's preliminary injunction ordered, *inter alia*, that defendants were enjoined  from suspending, terminating or reducing the amount of home health care services received by class members without first providing for federally required notice, fair-hearing rights and aid-continuing. 847 F.Supp. at 1086.  It also directed them to "take immediate steps to provide notice and hearing rights to members of plaintiffs' class who have had their home health care services suspended, terminated or reduced without the benefit of notice, the right to a hearing or aid-continuing since November 15, 1993 ... ."  *Id.*  The Court then issued the Plan implementing those directives, and ordered defendants to comply with that Plan with respect to any "adverse actions taken contrary to a treating physician's orders with respect to home health services."  900 F.Supp. at 653-63.  Thus, plaintiffs essentially got everything they asked for.

Plaintiffs also requested declaratory relief on all their claims, but since the Court never ruled on the dismissed claims, plaintiffs did not obtain that relief on those claims.  From day one of this case, however, injunctive relief was the main goal.  Plaintiffs sought to force defendants to make changes concerning their procedures relating to the provision of home health care services to Medicaid recipients.  That is what they accomplished in a state-wide class action.

Furthermore, even assuming that plaintiffs are not entitled to fees on the dismissed claims, there is no indication that any significant amounts of time were expended on them, particularly in the phase of the case for which the State is responsible pursuant to the parties' August 9, 2004 stipulation.  Based on my familiarity with this case, I also know that both the parties and the Court focused largely, if not exclusively, on plaintiffs' second claim for relief throughout this litigation. Although the State has filed a motion requesting that the Court hold a hearing to determine how

much time is attributable to these claims, I see no need to do so.  *See Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir.) (district court did not exceed its discretion in failing to provide a hearing; noting that "we are informed of nothing that would be developed in such a hearing that would alter the outcome"), *cert. denied*, 515 U.S. 1131 (1995); *In re Thirteen Appeals Arising Out of San Juan Dupont Hotel Fire Litig.*, 56 F.3d 295, 303 (1ˢᵗ Cir. 1995) ("When the written record affords an adequate basis for a reasoned determination of the fee dispute, the court in its discretion may forgo an evidentiary hearing").

For the same reasons, I also reject the State's argument that plaintiffs obtained only limited success in this case.  Although the State cites a number of instances in which the Court rejected certain assertions or requests made by plaintiffs (*e.g.*, concerning the adequacy of defendants' notices or non-detrimental changes in the level of home health care services), these concerned relatively minor matters.  On most if not all of the major issues, plaintiffs prevailed at virtually every turn, both here and in the Court of Appeals.


## VII. Fees on this Motion

Plaintiffs also seek attorney's fees incurred in bringing the instant motion and for time spent in replying to the State's opposition and in responding to the State's  motion for an evidentiary hearing.  Plaintiffs seek fees in the amount of $29,719.  The State does not contest or challenge the

amount requested for this work on the fee request.  Plaintiffs also seek $4,321.98 in costs and the State does not object to that amount either.

The Second Circuit has held that "a reasonable fee should be awarded for time reasonably spent in preparing and defending an application for § 1988 fees," and that "a reasonable fee should be awarded for opposing the culpable defendant's unsuccessful postjudgment motions." *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999).  I therefore grant plaintiff's request for fees incurred in connection with and subsequent to the filing of their motion for attorney's fees, in the full amount requested, $29,719.

## CONCLUSION

After settling with the County, plaintiffs sought fees for services in the litigation in the amount of $1,078,685.50.  I have reduced that figure by 8%, leaving a balance due of $992,390.66. To that amount, I award $29,719 for time spent on the fee application for a total fee award of $1,022,109.66.  I also award costs in the amount of $4,321.98.

The motion for a hearing (Dkt. #304) filed by defendants Robert Doar and Barbara A. DeBuono is denied.

Plaintiffs' motion for attorney's fees and costs (Dkt. #293) is granted.  Plaintiffs are awarded attorney's fees pursuant to 42 U.S.C. § 1988 in the amount of $1,022,109.66, and costs in the amount

of $4,321.98.  Defendant must make payment within thirty (30) days of entry of this Decision and

Order.

The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       July 27, 2005.